GEORGE T. PAETH and
MARGARET C. PAETH,

               Plaintiffs,

v.

WORTH TOWNSHIP and
BARBARA CUTCHER,

               Defendants.

_____/

Case Number 08-13926

Honorable David M. Lawson

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, AND DENYING DEFENDANTS' MOTION TO STRIKE EXPERT WITNESS REPORT

The plaintiffs in this case seek redress from a Michigan township and its building and zoning administrator for interfering with and delaying by several years the plaintiffs' efforts to renovate a cottage into a permanent residence. The complaint seeks a declaratory judgment, an injunction, and damages on the theory that the defendants (1) retaliated against the plaintiffs in violation of the First Amendment for successfully appealing to state court a zoning board decision denying a variance; (2) violated the plaintiff's rights under the Equal Protection Clause by selectively enforcing certain land use ordinances; and (3) violated the plaintiffs' substantive and procedural due process rights by denying a variance and issuing a stop work order without providing notice to the plaintiffs and an opportunity to respond. The parties have filed cross motions for summary judgment, which were argued in open court on April 23, 2009 and taken under advisement. The defendants argue that the zoning administrator is entitled to qualified immunity, the plaintiffs have not proven that the actions were taken pursuant to an official policy or custom so as to establish municipal liability, the

plaintiffs have no property interest that is protected by the Due Process Clause, the defendants' actions were not arbitrary so as to amount to a denial of substantive due process, the plaintiffs' equal protection claim must be dismissed because they have failed to show that they were treated differently than other similarly-situated individuals, and much of the plaintiffs' damages claim is barred by the statute of limitations. The defendants also move to strike the report of the plaintiffs' damages expert. The plaintiffs argue that the undisputed facts entitle them to relief because they have shown that the township officials acted pursuant to an official custom or policy, the defendants' issuance of a stop work order was intended to punish the plaintiffs for their successful appeal of the variance denial, the plaintiffs had a property interest in the continuation of their building project, and the defendants selectively enforced the land use ordinances in an arbitrary manner against them.

After carefully considering the arguments and the parties' submissions, the Court now finds as follows: first, the building and zoning administrator is not entitled to qualified immunity because she has been sued only in her official capacity, although her presence in the case is redundant since an official capacity action is tantamount to an action against the township, which already is a defendant; second, the plaintiffs have offered evidence sufficient to withstand summary judgment on the question of municipal liability; third, there is conflicting evidence on the defendants' motive in issuing the stop work order, so neither side is entitled to summary judgment on the First Amendment retaliation claim; fourth, the defendants are entitled to summary judgment on the Equal Protection selective enforcement claim because the plaintiffs failed to present any evidence that their requests for a variance and renewal of their building permit were treated less favorably than those of other similarly situated residents of Worth Township; fifth, the plaintiffs are entitled to summary judgment on their procedural due process claim because they had a protected property interest in

proceeding with construction on their property after the grant of the variance by the Sanilac County circuit court and the defendants conceded that they gave no prior notice, as required by state law, before posting the stop work order on November 5, 2007; sixth, the defendants are entitled to summary judgment on the due process claim for denial of the variance because the plaintiff had no protectable property interest in the issuance of a variance and the denial of the variance was not arbitrary; seventh, the plaintiffs' claims for damages caused by events preceding September 11, 2005 are foreclosed by a three-year statute of limitations, although the Court's other rulings render that defense moot; and eighth, there are no grounds on which to strike the plaintiffs' expert witness report. Therefore, the Court will grant in part and deny in part each side's motion for summary judgment, and deny the defendant's motion to strike the report of the plaintiffs' economic loss expert.

I.

Over ten years ago, plaintiffs George and Margaret Paeth purchased, by their description, "an old, abandoned cottage" in Worth Township as a second home. Instead of rehabilitating and selling it as originally planned, they apparently decided to renovate and keep it. In 1998, they embarked on their renovation plans, which included the addition of enclosed areas on the first floor, replacing the existing roof, and various other modifications. As renovated, the structure was to occupy the same footprint except for the northeast and northwest corners.

On the northwest corner, the covered porch was to become a part of the enclosed structure. Even before the modification, however, that part of the structure did not conform with the five-foot setback requirement in the ordinances then in place for the site (it appears that the setback requirement was changed to eight feet since the original permit was issued).

In 1998, Worth Township had no building department of its own, so the plaintiffs applied for building permits to the County of Sanilac. To receive a building permit from the county, the plaintiffs first had to apply to Worth Township for a land use permit, which required the plaintiffs to procure a survey of the property. It was during the process of obtaining building permits in late 1998 that the plaintiffs came into contact with defendant Barbara Cutcher, the zoning administrator for Worth Township at the time.

The plaintiffs obtained a property survey that revealed the non-conformance of the cottage's northwest corner. They claim to have notified Cutcher of the setback issue before April 27, 1999 when they obtained the land use permit, and Cutcher "represented that it would not be a problem and that [the plaintiffs] should continue the development of [their] property." Pls.' Mot. for Prelim. Inj. [dkt. # 2], Ex. 1 (Affidavit of George T. Paeth) at ¶ 4.

Worth Township issued the plaintiffs a land use permit with no difficulty, and the county followed with a building permit on June 17, 1999. On July 27, 1999, Sanilac County's building department inspected and approved the foundation, and the house was framed shortly thereafter.

In November 1998, the plaintiffs applied for and received a well drilling permit from the Sanilac County Health Department. In 1999, they contracted with a well drilling company, but before work could begin the plaintiffs learned that Worth Township had revoked all permits on new wells due to the implementation of the township's new municipal water system. The plaintiffs then applied to tap into the water system, but their application was not addressed immediately.

As the plaintiffs explain it, in June 2001, in order to access the township's water mains, George Paeth contracted with an excavator who obtained a municipal water permit from Worth Township's water authority. The excavator began to trench, but a Worth Township inspector arrived

on-site and shut down the excavator's operations without explanation. The inspector then revoked the plaintiffs' water permit without furnishing a justification. The plaintiffs did not connect to the township's water main until August 2002; the property was without water for nearly three years. The plaintiffs turned to neighbors during that time for their water needs. They contend that the absence of water on the property also impeded their ability to obtain construction loans.

The plaintiffs' troubles with Worth Township began in earnest in 2002, when the township formed its own building department. Barbara Cutcher had become the Worth Township Zoning and Building Administrator. She declared that the plaintiffs' building permit had expired in 2002. Cutcher alleges that she received that information from Sanilac County Inspector Strickler. The plaintiffs disagreed with her, stating that under the applicable National Building Code, a permit could not lapse unless either the permit holder failed to begin work within six months or construction halted for more than six months. Nonetheless, because the county officials insisted, the plaintiffs applied for another building permit, this time directly from Worth Township, which they received on July 7, 2003.

Cutcher contacted the plaintiffs again in June 2004 after they complained that their neighbors had constructed a fence on adjacent property without a permit. It was then that Cutcher notified the plaintiffs that her attention had been directed to their structure's noncompliance with the township's setback ordinance, which in the meantime increased from five feet to eight feet. Cutcher sent a letter stating:

> Your original site plan shows that the house will be 8' from the lot line on the West side. I was requested to measure this out and find that you are 8' from the lot line on the Southwest corner but you are only 4' from the lot line on the Northwest corner. Our ordinance requires an 8 foot set back including overhangs. This is a serious problem. You must contact Lynn Laughlin as she does the Zoning enforcement.

Mot. for Prelim. Inj. [dkt #2], Ex. 7 (Letter from Barbara Cutcher to Margaret Paeth, June 17, 2004).

Cutcher testified that the letter was not her idea; rather former township supervisor Janice Putz instructed her to contact the plaintiffs. Cutcher testified at her deposition as follows:

> A.  Janice Putz was the supervisor and I remember a disagreement between myself and Janice, because she was telling me I should write this letter and I was disagreeing with her because it was a setback problem, that Lynn should write the letter because she was zoning. The supervisor insisted that because I issued the permit and I – the original land use permit and I was zoning administrator at that time, it was my responsibility to write the letter. So I wrote the letter, but Lynn [Laughlin] . . . was zoning administrator at the time. . . .
>
> Q.  Did Janice Putz tell you why this letter should be written?
>
> A.  Yes. . . .  It had to do with the fence, the neighboring fence.  Once that went up, the lot line was different than what the original survey showed it to be. . . .
> . . .
>
> Q.  Okay.  Did you protest to Ms. Putz that hey, they've had a permit since 1999, we're now five years into that, you know, what is the need for the setback?
>
> A.  I can't remember what discussion went on.
>
> Q.  Okay.  Did you think it was appropriate to send this letter, Exhibit 4?
>
> A.  I thought it was inappropriate for me to send it.  I felt the letter needed to be sent, but I felt it was the zoning administrator's position, not mine.
>
> Q.  You thought the contents were correct in that letter, correct?
>
> A.  Yes, the contents were correct.

Defs.' Mot. for Sum. J. [dkt. # 20], Ex. C (Cutcher dep.) at 71-72.

The plaintiffs insist that Cutcher knew about the structure's nonconformity at the time their original permit was issued, and therefore the township should be estopped from making the arguments to the contrary.  In Cutcher's June 17 letter, however, she notified the plaintiffs that their permit had been extended to July 2004.  In response, the plaintiffs submitted a variance application on June 22, 2004, asking the township to reconsider the necessity of a variance because the work was performed "in good faith and in accordance with previously approved permits."  Pls.' Mot. for Prelim. Inj. [dkt # 2], Ex. 8 (Zoning Bd. of Appeal App. for Variance), at 2.

The next day, Worth Township's new zoning administrator, Lynn Laughlin, requested another certified survey of the plaintiffs' property. The plaintiffs complied, and the updated survey showed a distance of three feet and six inches between the northwest corner of the structure and the westerly property line. The roof overhang extended for approximately another foot. According to the defendants, the 2004 survey differed markedly from the 1999 survey; the 1999 survey incorrectly depicted the location of the northwest corner of the structure relative to the westerly lot line, and therefore Cutcher relied on incorrect information in approving the plaintiffs' land use permit in 1999.

Laughlin then requested an explanation of "what it is that [the plaintiffs] are requesting" so that the county could include the narrative into the notices of a hearing. Pls.' Mot. for Prelim. Inj. [dkt # 2], Ex. 11 (Laughlin Letter, Sept. 1, 2004). On January 6, 2005, the plaintiffs submitted a statement explaining that they should not be required to apply for a variance because they began construction in reliance on permits the township previously issued, which did not expire. The plaintiffs allege that Edward Smith, the township supervisor, invited Mr. Paeth to meet on a Saturday when the building department was closed, and during that meeting Smith "made representations to Mr. Paeth to the effect that granting the variance would not be a problem and that proper procedure would be followed." Pls.' Mot. for Prelim. Inj. [dkt # 2], at 5.

The hearing on the variance request finally took place on May 18, 2005, eleven months after the application. About sixty people attended the meeting. Board members read several neighbors' letters into the record. Most opposed the construction for a variety of reasons: some based on the prolonged construction time, others because of a belief that the plaintiffs disregarded the building ordinance, and others because of the perception that the plaintiffs never obtained valid permit to

begin with, or expanded their renovation beyond the original allowances. The plaintiffs allege that the board members selectively read only the disapproving comments. Thomas Gilbert, the ZBA chairman at the time, could not explain "why the people who were for the variance were not heard." Pls.' Mot. for Sum. J. [dkt. # 22], Ex. 16 (Gilbert dep.) at 35. Cutcher also apparently provided adverse commentary to the ZBA.

The ZBA voted unanimously to deny the request for a variance, which meant that the Paeths had to remove the offending portion of the structure to bring the project back into compliance. The ZBA also rejected the plaintiffs' argument that they did not have to renew their building permits and could continue construction under the old permits. The county took the position that building permits are valid only for one year after issuance, regardless of continuation of construction activity.

Margaret Paeth testified that the hearing was a sham because the ZBA had decided to deny the variance long before the hearing. She testified that she overheard the township treasurer tell someone in the crowd that the issue had already been determined, and the hearing was just a formality:

> Q. . . . did you hear the Township treasurer say anything in reference to your appeal?
> A. She said to whomever she was speaking to, not to worry, that it had already been determined or already been decided.
> Q. How do you know that she was referencing your appeal?
> A. Because everyone in the room was engaged in what it was all about.
> . . .
> Q. Did you hear commentary regarding anything – discussion about anything other than your appeal by the treasurer?
> A. No.

Pls.' Mot. for Sum. J. [dkt. # 22], Ex. 9 (M. Paeth dep.) at 72.

According to Worthship Township Supervisor Edward Smith, other residents had setback variances denied after a structure had been built. Smith recalled at least three other cases in which

"permits were pulled, buildings are up, and the building official went out and requested the homeowner to get a side yard setback" after the building was already finished. Defs.' Mot. for Sum. J. [dkt. # 20], Ex. R (Smith dep.) at 43.

The plaintiffs appealed the decision to the Sanilac County, Michigan circuit court, which found that the ZBA applied the wrong standard to the plaintiffs' requested non-use variance and remanded the matter to the ZBA. On remand, the ZBA once again upheld the denial of the variance, but it never notified the plaintiffs of the hearing. The plaintiffs returned to court and succeeded in getting the third hearing. However, on November 13, 2006, the ZBA denied the plaintiffs a variance again.

The plaintiffs appealed that denial to the circuit court, which reversed the ZBA and granted the variance. Worth Township appealed the circuit court's decision, but the Michigan Court of Appeals dismissed the claim of appeal for lack of jurisdiction on July 13, 2007. Three months later, an attorney for Worth Township confirmed in a letter that the township would not pursue an appeal to the Michigan Supreme Court. The attorney added:

> The Township's decision clears the way for Mr. Paeth to obtain or renew all necessary building permits and bring his project to a speedy conclusion – first by removing all of the debris and finishing work on the exterior, calming, perhaps, his neighbors, who have endured too long.

Mot. for Prelim. Inj. [dkt #2], Ex. 17 (Letter from Neil J. Lehto to Jeffrey C. Gerish, Oct. 31, 2007).

That did not end the matter for the defendants, however. On November 5, 2007, Barbara Cutcher posted a stop work order on the property, still insisting that the plaintiffs had to obtain a new permit. Cutcher testified that Township Clerk Marcy Bartnicziak instructed her to post the order. At her deposition, Cutcher read from her contemporaneous file note that explained her actions:

A. I was instructed by a Clerk Marcy to go post a work stop order on Paeths because the Township was not going to appeal the court decision. I questioned why. She said the ZBA, in their meeting, determined that the building permit was expired, sent note 3:00, posted the property as instructed at 3:30 p.m. with note to contact me for permit renewal.

Q. Okay. Does this refresh your recollection as to the reason why the stop work order was posted?

A. Yes.

Q. Okay. So it was posted because the Township was not going to appeal the decision of the Court of Appeals?

. . .

A. That's what she told me.

Defs.' Mot. for Sum. J. [dkt. # 20], Ex. C. (Cutcher dep.) at 210-11.

Apparently, Cutcher harbored some doubt about the validity of her actions and Bartnicziak's instructions. She later testified that she "felt like [she] should notify [the Paeths] by letter to begin with and not post [the stop work order] because there had been so much going on with it." *Id*. at 60. She said she knew "in [her] heart" that posting a stop work order "was wrong," but she feared being fired if she did not comply with Bartnicziak's directions. *Id*. at 69.

Jonathan Rundels, a member of the ZBA, corroborated Cutcher's story, recalling that Cutcher visited him in November of 2007 and complained about Bartnicziak's insistence that she post a stop work order on the plaintiffs' property. However, Rundels did nothing to stop Cutcher from posting the order, claiming ignorance of the rules. Bartnicziak's insistence on posting a stop work order was also confirmed by Edward Smith. ZBA chairman Thomas Gilbert also confirmed that Marcy would usually go "to great lengths to get her way," and that she has done things out of spite even with respect to Mr. Gilbert himself. Pls.' Mot. for Sum. J. [dkt. # 22], Ex. 16 (Gilbert dep.) at 61-62.

Whatever the motivation, the facts are undisputed that the plaintiffs were not given notice or a hearing before the township posted the stop work order, despite a provision of state law that

requires notice. *See* Mich. Comp. Laws § 125.1512(3) ("If construction is being undertaken contrary to a building permit, . . . the enforcing agency shall give written notice to the holder of the building permit . . . notifying him of the violation of this act . . . and to appear and show cause why the construction should not be stopped."). Instead, the township served the plaintiffs with an application for another building permit, requiring them to include a drawing of the construction with measurements of the first and second floor. The plaintiffs' attorney contacted the township's counsel to resolve the matter, but apparently received no response.

The plaintiffs then contacted a director of the State of Michigan Office of Local Government and Consumer Services for confirmation that their 2003 building permit was still valid. State Inspector Michael Somers contacted Ms. Cutcher for some explanations and initially told Ms. Cutcher that she was "right in posting work stop and requiring a new permit and drawing." Cutcher Dep. at 153. However, it appears that Somers's supervisor, Henry Green, disagreed with Somers and Somers ultimately issued a letter to the plaintiffs stating that they "may begin work to complete [their] residence upon meeting the conditions set forth within the letter for code compliance." Defs.' Mot. for Sum. J. [dkt. # 20], Ex. O (Somers Letter, May 22, 2008). On March 24, 2008, Cutcher reversed her position and wrote to the plaintiffs to state that the permit issued by the township on July 7, 2003 is "still a valid permit" and they "can begin work again on [their] home." Defs.' Mot. for Sum. J., Ex. P (Cutcher Letter, Mar. 24, 2008). Yet, Ms. Cutcher still insisted that the plaintiffs "contact [her] prior to beginning [their] work," stating: "I need to do an inspection to determine compliance with the code. I have never done an inspection on your home so I am also requesting an as-built drawing for review." *Ibid.*

The involvement of the township officials eventually came to a dramatic end. Cutcher pleaded guilty to forgery of assessment documents in an unrelated matter, and she was disciplined by the State of Michigan for "falsif[ying] Clyde Township Board of Review documents by cutting and pasting Board of Review members' signature onto Board of Review affidavits and a Board of Review Report." Pls.' Mot. for Summ. J., Ex. 20. The township treasurer, [first name] Shade, was convicted of embezzlement. The township's building department was dissolved by the State of Michigan in July 2008. Cutcher did not remove the stop work order until October 2008, notwithstanding the State of Michigan's letter sent to the township on May 22, 2008 directing the order to be removed. In the meantime, for two years while Sanilac County circuit court was considering the plaintiffs' matter and until the stop work order was removed, the plaintiffs agreed not to undertake any construction on the property.

The plaintiffs' complaint states four counts, all brought under 42 U.S.C. § 1983: violation of the plaintiffs' First Amendment rights when the township retaliated against the plaintiffs for appealing the decision of the ZBA in 2005 (count I); violation of the Equal Protection Clause based on the defendants' policy of selectively enforcing unlawful decisions against the plaintiffs when they engaged in protected activities under the First Amendment (count II); violation of substantive and procedural due process by issuing a stop work order without notice and an opportunity to respond (count III); and a request for mandamus and superintending control over the defendants (count IV). The parties agree that the last count of the complaint is now moot since the defendants stipulated to the entry of an order removing the stop work order on October 28, 2009. Both sides seek summary judgment in their favor as a matter of law.

## II.

The standards for evaluating a motion for summary judgment are well known but bear repeating here.  As the Sixth Circuit recently explained:

> Both claimants and parties defending against a claim may move for summary judgment "with or without supporting affidavits."  Fed. R. Civ. P. 56(a), (b).  Such a motion presumes the absence of a genuine issue of material fact for trial.  The court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts.  *Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002).  Once that occurs, the party opposing the motion then may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence in order to defeat the motion.  *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989).

*Alexander v. CareSource*, 576 F.3d 551, 557-58 (6th Cir. 2009).  In addition, when "'reviewing a summary judgment motion, credibility judgments and weighing of the evidence are prohibited.  Rather, the evidence should be viewed in the light most favorable to the non-moving party. . . . Thus, the facts and any inferences that can be drawn from those facts[] must be viewed in the light most favorable to the non-moving party.'"  *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 374 (6th Cir. 2009) (quoting *Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005) (citations omitted)); *see also Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003) ("In evaluating the evidence, [the district court] 'draw[s] all reasonable inferences therefrom in a light most favorable to the non-moving party.'") (quoting *PDV Midwest Refining, LLC v. Armada Oil & Gas Co.*, 305 F.3d 498, 505 (6th Cir. 2002)).

The fact that the parties have filed cross motions for summary judgment does not automatically justify the conclusion that there are no facts in dispute. *Parks v. LaFace Records*, 329 F.3d 437, 444 (6th Cir. 2003) ("The fact that the parties have filed cross-motions for summary judgment does not mean, of course, that summary judgment for one side or the other is necessarily appropriate."). Instead, the Court must apply the well-recognized standards when deciding such cross motions: when this Court considers cross motions for summary judgment, it "must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party." *Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503, 506 (6th Cir. 2003).

The plaintiffs' complaint is based on 42 U.S.C. § 1983. Under section 1983, the plaintiffs must establish that a person acting under color of state law deprived them of a right secured by the Constitution or laws of the United States. *Berger v. City of Mayfield Heights*, 265 F.3d 399, 405 (6th Cir. 2001); *Ahlers v. Schebil*, 188 F.3d 365, 370 (6th Cir. 1999). Section 1983 is not itself a source of substantive rights; rather, it provides a vehicle for vindicating rights provided by the Constitution. *Braley v. City of Pontiac*, 906 F.2d 220, 223 (6th Cir. 1990). The defendants do not challenge the state-action component of the plaintiffs' claims. Rather, they contend for a variety of reasons that township officials' conduct did not violate the plaintiffs' federal rights in a manner for which the defendants may be held accountable.

## A. Qualified Immunity

Defendant Barbara Cutcher contends that she is entitled to qualified immunity from liability for her conduct relating to the construction delays in the plaintiffs' renovation. Qualified immunity is an affirmative defense that protects state officials from personal liability for civil damages when their conduct does "not violate clearly established statutory or constitutional rights of which a

reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To become personally liable, a public official must be sued in her individual capacity. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("[W]hile an award of damages against an official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself."). In this case, the plaintiffs sued Barbara Cutcher specifically in her official capacity only. A suit against a public official in her official capacity is merely "another way of pleading an action against an entity of which an officer is an agent." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 n.55 (1978); *see also Everson v. Leis*, 556 F.3d 484, 493 n.3 (6th Cir. 2009). An official-capacity action, therefore, imposes liability on the entity that the official represents, not the individual personally. *Brandon v. Holt*, 469 U.S. 464, 471-72 (1985). Because qualified immunity protects a public official sued in her individual capacity from civil damages, qualified immunity is not available to the public entity itself or to an official acting in her official capacity. *Everson*, 556 F.3d at 501 n.7; *see Myers v. Potter*, 422 F.3d 347, 352 (6th Cir. 2005). The defendants' motion for summary judgment based on qualified immunity, therefore, will be denied.

### B. Municipal Liability

The defendants also argue that the plaintiffs have not brought forth facts that establish the liability of the township as an entity as a result of the conduct of its officials. A municipality cannot be liable solely for the constitutional torts of its employees; that is, it cannot be liable on a *respondeat superior* theory. *Monell*, 436 U.S. at 691; *see also Powers v. Hamilton County Public Defender Comm'n*, 501 F.3d 592, 607 (6th Cir. 2007). Rather, liability will attach only where the plaintiffs establish that the municipality engaged in a "policy or custom" that was the "moving

force" behind the deprivation of the plaintiffs' rights. *Monell*, 436 U.S. at 694; *see also Doe v. Claiborne County*, 103 F.3d 495, 507 (6th Cir. 1996) ("Under *Monell*, the [defendants] cannot be found liable unless the plaintiff can establish that an officially executed policy, or the toleration of a custom . . . leads to, causes, or results in the deprivation of a constitutionally protected right.").

The *Monell* Court described a municipal policy as including "a policy statement, ordinance, regulation, or decision officially adopted and promulgated. . . ." 436 U.S. at 690. An actionable "custom," in contrast, "has not received formal approval through . . . official decisionmaking channels." *Monell*, 436 U.S. at 691. A section 1983 plaintiff may establish the existence of a custom by showing that policymaking officials knew about and acquiesced to the practice at issue. *Memphis, Tenn. Area Local, Am. Postal Workers Union v. City of Memphis*, 361 F.3d 898, 902 (6th Cir. 2004). Municipal officers "who have 'final policymaking authority' may by their actions subject the government to § 1983 liability." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988). As a general rule, "whether a particular official has 'final policymaking authority' is a question of state law." *Ibid.* The Sixth Circuit has clarified that a public official has final policymaking authority if that official's decisions are "'final and unreviewable and are not constrained by the official policies of superior officials.'" *Adair v. Charter County of Wayne*, 452 F.3d 482, 493 (6th Cir. 2006) (citing *Waters v. City of Morristown*, 242 F.3d 353, 362 (6th Cir. 2001)). Policymaking authority "can be delegated to [a public officer] by other officials who have final policymaking authority." *Feliciano v. City of Cleveland*, 988 F.2d 649, 655 (6th Cir. 1993).

The official actions cited by the plaintiffs as constituting violations of their federal rights are the denial of a variance by the ZBA and Cutcher's issuance of the stop work order. As to the first

action, the ZBA is a final decision making body. ZBA proceedings are final by statute, and are only reviewable in a circuit court review. *See Sun Cmties v. Leroy Twp.*, 241 Mich. App. 665, 670, 617 N.W.2d 42, 45 (2000) (citing Mich. Comp. Laws § 125.293a (repealed 2006)). A municipal legislative body does not have the power to overrule the ZBA decision. *Cf. Shulhan v. Matulewicz*, 5 Mich. App. 399, 402-03, 146 N.W.2d 717, 718-19 (1966) (concluding that the common council did not have the power to overrule the zoning appeal board decision and order defendant not to issue the permit). The decision of the ZBA, therefore, represents the official policy of the township, and if its decision to deny the variance violated the plaintiffs' federal rights, the township would be accountable under 42 U.S.C. § 1983. *See Dubuc v. Green Oak Twp.*, 958 F. Supp. 1231, 1242 (E.D. Mich. 1997).

The decision to issue the stop work order is a bit more complicated. The evidence plainly shows that Cutcher issued and posted the order. At the time, she was the building inspector, apparently having resigned as zoning administrator sometime in 2004. She testified that the only individuals in the township government with authority to post a stop work order in 2007 was the building inspector and the zoning administrator, Joe Schmidt. Cutcher testified that the stop work order was not her idea; the decision came from higher up. She explained that the township clerk and board member, Marcy Bartniczak, directed Cutcher to post the stop work order on the plaintiffs' property and, afraid for her job, Cutcher complied. Cutcher stated that the same was true of her demand for a new permit in 2004. She testified that Janice Putz, the Worth Township supervisor, told her to write a letter to the plaintiffs demanding that they reapply for a new permit.

Certainly Cutcher had the authority to issue a stop work order, and even if she was not the final authority over that decision, there is evidence that high-ranking board officials approved – if

not directed – her action. A fact finder could conclude that the action represented the official position of the township, since the only person who was in charge of the building department – Cutcher – acted on the command of two separate high-ranking members of the board, who were the final arbiters in this dispute. Ms. Bartniczak and Ms. Putz's edicts "may fairly be set to represent official policy," *see Ford v. County of Grand Traverse*, 535 F.3d 483, 495 (6th Cir. 2008), and since the board was aware of, and did nothing to reverse, Cutcher's actions, it can be held liable. *See Arendale v. City of Memphis*, 519 F.3d 587, 602 (6th Cir. 2008) ("even if the allegedly unconstitutional decision is initially made by a subordinate official, when that decision is appealed to and affirmed by an official with final authority over a matter, the municipality may be held liable for this affirmance").

### C. Retaliation for Exercising First Amendment Rights

The plaintiffs contend that township officials issued the stop work order in retaliation for the plaintiffs' successful appeal to the Michigan courts of the ZBA's denial of a variance. They base their claim in part on Cutcher's deposition testimony:

> A. I was instructed by a Clerk Marcy to go post a work stop order on Paeths because Township was not going to appeal the court decision.
>
> Q. Okay. Does this refresh your recollection as to the reason why the stop work order was posted?
>
> A. Yes.
>
> Q. Okay. So it was posted because the Township was not going to appeal the decision of the Court of Appeals?
> . . .
>
> A. That's what she told me.

Cutcher dep. at 211. Cutcher also wrote a contemporaneous note that she was "instructed by Clerk Marcy to go post a work stop order on Paeths because the Twp was not going to appeal the Court decision." Pls.' Mot. for Sum. J. [dkt. # 22], Ex. 28 (Cutcher Notes). Thomas Gilbert also testified:

> Q.   Do you know why Miss Cutcher was under the impression that the Zoning Board of Appeals met and instructed the clerk to instruct her to post a stop work order?
> A.   Sounds like something Marcie would do.
> Q.   What do you mean by that?
> A.   I mean that Marcie doesn't like a decision, she goes, I've seen it personally where she goes to great lengths to get her way.

Gilbert dep. at 61-62. Edward Smith likewise confirmed that "[t]he clerk told Barb to [post a stop work order]. Told Barb to do it. And Barb was fearful because Barb's an employee of the township board." Smith dep. at 33. Finally, ZBA member Jonathan Rundels testified that he did not intervene because he anticipated the "emotional uproar that would happen." Rundels dep. at 63. "I wasn't sure of the rules and who had to do what at that point in time. I have now learned what the rules are, so I would have had a different answer at the time if I had known what the rules were." *Id.* at 62-63.

The defendants argue that there is no evidence that the actions of the township officials in issuing the stop work order were motivated by the plaintiffs' exercise of First Amendment rights.

The governing law on claims of retaliation for exercising First Amendment rights was set forth by the Sixth Circuit in *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc), as follows:

> A retaliation claim essentially entails three elements: (1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two – that is, the adverse action was motivated at least in part by the plaintiff's protected conduct.

The plaintiffs engaged in conduct protected by the First Amendment when they resorted to the Sanilac County circuit court to criticize the ZBA's repeated denials of their non-use variance and seek relief. *McCurdy v. Montgomery County, Ohio*, 240 F.3d 512, 519 (6th Cir. 2001) ("There can be no doubt that the freedom to express disagreement with state action, without fear of reprisal based on the expression, is unequivocally among the protections provided by the First Amendment.")

(citing *Glasson v. City of Louisville*, 518 F.2d 899, 904 (6th Cir. 1975)). The stop work order amounted to adverse action. The continued interference with the plaintiffs' construction project is a sufficiently severe consequence to satisfy the second element of a retaliation claim. Moreover, because the plaintiffs are private citizens, "the level of injury [they] must allege would be the lower limit of a cognizable injury for a First Amendment retaliation claim." *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 724 (6th Cir. 2010). Finally, there is ample evidence that township officials posted the stop work order as a ham-handed method of overriding the adverse judicial decision and punishing the plaintiffs for their successful resort to the courts. As noted above, the township clerk and board member stopped further work on the plaintiffs' property because she did not "like a decision [and went] to great lengths to get her way." Gilbert dep. at 61-62. If that testimony is believed by the fact finder, the plaintiffs will have established a violation of their First Amendment rights redressable by section 1983. *Barrett v. Harrington*, 130 F.3d 246, 264 (6th Cir.1997) ("[T]he First Amendment right to criticize public officials is well-established and supported by ample case law . . . it is well-established that a public official's retaliation against an individual exercising his or her First Amendment rights is a violation of § 1983.").

### D. Equal Protection

The plaintiffs also contend that the township's denial of a variance and posting the stop work order violated their rights under the Equal Protection Clause because of the selective enforcement of the land use ordinances against them as a class of one. *See Village of Willowbrook v. Olech*, 528 U.S. 562 (2000). The defendants argue that they treated other residents the same way when structures encroached onto the side yard setback.

The Supreme Court has recognized equal protection claims by a "class of one" when a plaintiff proves "that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Olech*, 528 U.S. at 564. To establish a class-of-one selective enforcement claim, the plaintiffs must offer some evidence "either that [the township] distinguished between [the plaintiff and others] based on some bad reason, proving intent, *see Farm Labor Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523, 533-34 (6th Cir. 2002), or that [the township] had no rational reason to distinguish between [the plaintiff and others]. . . ." *Boone v. Spurgess*, 385 F.3d 923, 932 (6th Cir. 2004). Selective treatment requires proof that others were similarly situated and that the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations such as "'race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person.'" *R.S.S.W., Inc. v. City of Keego Harbor*, 18 F. Supp. 2d 738, 746 (E.D. Mich. 1998), *rev'd in part on other grounds*, 397 F.3d 427 (6th Cir. 2005) (quoting *Zahra v. Town of Southold*, 48 F.3d 674, 683 (2d Cir. 1995)).

The plaintiffs have not offered any evidence of comparators who were allowed to proceed with construction despite the violation of the setback ordinance. The defendants, on the other hand, point to three similarly-situated individuals who were likewise required to apply for variances and whose variances were denied. Based on the present record, there are no material facts in dispute; the plaintiffs have not shown that they were singled out or otherwise denied the equal protection of the law. The defendants are entitled to summary judgment on this claim.

E. Procedural and Substantive Due Process

1.

The plaintiffs' procedural due process claim centers mainly on the township's issuance of the stop work order without prior notice, which prevented the plaintiffs from completing their renovation as authorized by the 2003 building permit. The defendants maintain that the building permit expired because the plaintiffs suspended construction for over six months during the two-year period they litigated the setback variance issue in the ZBA and the circuit court.

In order to establish a procedural due process violation, the plaintiffs must show that (1) they had a life, liberty, or property interest protected by the Constitution; (2) they were deprived of that interest by a state actor; and (3) they were not afforded timely and adequate process under law. *Waeschle v. Dragovic*, 576 F.3d 539, 544 (6th Cir. 2009). As noted, the plaintiffs believe they had a property interest in the continuation of construction. "Property interests are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 611 (6th Cir. 2006) (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972) (internal quotation marks omitted)).

Under Michigan law, the issuance of a valid building permit bestows a right on the property owner to begin and continue construction under the terms of the permit, even for a nonconforming use. *Dingeman Adver., Inc. v. Algoma Twp., Kent County*, 393 Mich. 89, 98-99, 223 N.W.2d 689, 691-92 (1974). The defendants point to a provision in the state regulations that states that "[e]very permit issued shall become invalid unless the work authorized by such permit is commenced within

180 days after its issuance, or if the work authorized by such permit is suspended or abandoned for a period of 180 days after the time the work is commenced." 2003 Mich. Residential Code R105.5. However, the suspension of construction and ensuing delay in this case were caused by the dispute over the setback requirement and the litigation over the variance, including various appeals to the ZBA and the Michigan courts. A provision of Michigan law in effect at the time stated that appeal "stays all proceedings in furtherance of the action appealed from." Mich. Comp. Laws § 125.292 (repealed 2006). Moreover, the township instructed the plaintiffs in June of 2004 to complete their construction "once [they] have taken care of the set back issue." Pls.' Mot. for Prelim. Inj. [dkt. # 2], Ex. 7 (Cutcher Letter, July 17, 2004). Finally, in her March 24, 2007 letter, Barbara Cutcher wrote to the plaintiffs on behalf of the township and acknowledged that "[t]he permit the Township issued you on July 7, 2003 number 03-0078 as per the State determination is still a valid permit. You can begin work again on your home." Pls.' Mot. for Prelim. Inj. [dkt. # 2], Ex. 24 (Cutcher Letter, Mar. 24, 2008). The evidence in the record establishes as a matter of law that the plaintiffs had a property interest in the continued construction under the 2003 building permit once the variance issue was resolved by the state court.

The record also contains no disputed facts as to the deprivation of that property interest in the form of the stop work order. The "issuance of the stop work order was an act in and of itself, instantly manifesting a mature procedural due process claim." *Hearns Concrete Constr. Co. v. City of Ypsilanti*, 241 F. Supp. 2d 803, 810 (E.D. Mich. 2003).

Finally, there is the question what process the plaintiffs were due. "The right to procedural due process requires that when a state seeks to terminate a protected interest it must afford notice and opportunity for hearing appropriate to the nature of the case." *Club Italia Soccer & Sports Org.,*

*Inc. v. Charter Twp. of Shelby, Mich.*, 470 F.3d 286, 296 (6th Cir. 2006) (citing *Roth*, 408 U.S. at 570) (internal quotation marks omitted). State law likewise requires written notice and a hearing *before* a stop work order is posted. *See* Mich. Comp. Laws § 125.1512(3). In this case, building inspector Cutcher admitted that she provided the plaintiffs no advance notice before she posted the stop work order following the plaintiffs' successful appeal of the variance denial. The line of cases suggesting that available post-deprivation remedies may vitiate a procedural due process violation, *see, e.g., Parratt v. Taylor*, 451 U.S. 527 (1981), *overruled on other grounds by Daniels v. Williams*, 474 U.S. 327 (1986)), does not diminish the transgression here. Post-deprivation remedies will be deemed sufficient "only if: (1) the deprivation was unpredictable or 'random'; (2) predeprivation process was impossible; and (3) the state actor was not authorized to take the action that deprived the plaintiff of property or liberty." *Mackey v. Dyke*, 29 F.3d 1086, 1093 (6th Cir. 1994); *see also Zinermon v. Burch*, 494 U.S. 113, 132 (1990) ("In situations where the State feasibly can provide a predeprivation hearing before taking property, it generally must do so regardless of the adequacy of a postdeprivation tort remedy to compensate for the taking."). The record in this case supports none of those contingencies.

The Court finds, therefore, that there is no dispute of material facts on this claim, and the plaintiffs have established a procedural due process violation by the defendants as a matter of law.

## 2.

The plaintiffs' substantive due process claim is based on the theory that the township's denial of their request for a non-use variance and posting the stop work order was a vendetta against them and violated their constitutionally protected interest in the building permit and continued

construction. The defendants argue that their actions were taken in the good faith belief that the building permit expired and the proposed renovation of the structure violated the setback ordinance.

The right to substantive due process prohibits the government from infringing on "fundamental rights" without sufficient justification. *Rendell-Baker v. Kohn*, 457 U.S. 830, 837-38 (1982). "To state a cognizable substantive due process claim, the plaintiff must allege 'conduct intended to injure in some way unjustifiable by any government interest' and that is 'conscience-shocking' in nature." *Mitchell v. McNeil*, 487 F.3d 374, 377 (6th Cir. 2007) (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998)). "'What seems to be required is an intentional infliction of injury . . . or some other governmental action that is 'arbitrary in the constitutional sense.'" *Stemler v. City of Florence*, 126 F.3d 856, 869 (6th Cir. 1997) (quoting *Lewellen v. Metro. Gov't of Nashville & Davidson County*, 34 F.3d 345, 351 (6th Cir. 1994)). However, substantive due process protects only against state action that is not otherwise proscribed by the plain text of other constitutional amendments. *See Ciminillo v. Streicher*, 434 F.3d 461, 465 (6th Cir. 2006) (reasoning that "[a]lleged conduct that does not implicate a constitutional right protected by another amendment will be analyzed under the substantive due process component of the Fourteenth Amendment"). Where a plaintiff has recourse to an "explicit textual source of constitutional protection," *Graham v. Connor*, 490 U.S. 386, 395 (1989), a more general claim of substantive due process is not available. *See Lewis*, 523 U.S. at 842.

That part of the plaintiffs' substantive due process claim based on the township's refusal to grant a variance is not well taken. "[A] court should not interfere with local zoning decisions unless the locality's action 'has no foundation in reason and is a mere arbitrary or irrational exercise of power having no substantial relation to the public health, the public morals, the public safety or the

public welfare in its proper sense.'"  *Warren v. City of Athens, Ohio*, 411 F.3d 697, 707 (6th Cir. 2005) (quoting *Nectow v. City of Cambridge*, 277 U.S. 183, 187-88 (1928)).  Where a variance is denied due to cost and public safety concerns, the applicant's substantive due process rights are not violated.  *See Braun v. Ann Arbor Charter Twp.*, 519 F.3d 564, 574 (6th Cir. 2008)

In this case, the ZBA had discretion to deny the requested variance, and therefore the plaintiffs had no property interest in a variance.  *See Triomphe Investors v. City of Northwood*, 49 F.3d 198, 203 (6th Cir. 1995) (holding that, even though a special use permit had been issued previously on the same property, the owner did not have a property interest in the issuance of another special use permit); *Bauss v. Plymouth Twp.*, 408 F. Supp. 2d 363, 367-68 (E.D. Mich. 2005) (holding that property owners seeking a zoning variance did not have a legitimate claim of entitlement to a variance); *Crowley v. Courville*, 76 F.3d 47 (2d Cir. 1996) (finding that the plaintiff had no property interest in a new or existing parking variance where the language of the ordinance gave substantial discretion to the board and the grant was reviewable by other entities); *see also Braun*, 519 F.3d at 573 (holding that the zoning board "certainly possessed the discretion to deny the plaintiffs' request [for a variance]; consequently, no cognizable property right exists, which, in turn, means that procedural due process protections are not triggered").  State law in effect at the time vested broad discretion in the ZBA when deciding requests for variances.  *See* Mich. Comp. Laws § 125.293.  The plaintiffs cite the unpublished Sixth Circuit case of *Dorr v. City of Ecorse*, No. 07-1604 (6th Cir. Dec. 29, 2008), which held that the city's refusal to grant the plaintiff a certificate of occupancy even though the plaintiff completed all requisite inspections and the circuit court reversed the ZBA's denial and ordered the grant constituted a substantive due process violation.  However that case does not govern the township's conduct that occurred in this case prior

to the final circuit court action. Until that point, the township retained discretion to reject the non-use variance request and insist that the setback ordinance be enforced.

The township's conduct after the courts granted the variance is indefensible, and there is evidence that the official directive to post the stop work order was vindictive. However, that conduct can be addressed by the more specific alleged constitutional violations of First Amendment rights and procedural due process under the Fourteenth Amendment – both of which are "explicit textual source[s] of constitutional protection," *Graham*, 490 U.S. at 395 – so the more general claim based on substantive due process is not available. *Lewis*, 523 U.S. at 842.

The Court finds, therefore, that the defendants are entitled to summary judgment on the substantive due process claim.

### F. Statute of Limitations

The complaint in this case was filed on September 11, 2008. The defendants argue that the plaintiffs may not recover for any of the township's wrongful conduct that allegedly occurred before September 11, 2005 because of the three-year statute of limitations bar. The plaintiffs argue that the continuing wrong doctrine preserves their claims.

A three-year statute of limitations applies to claims brought under 42 U.S.C. § 1983 in federal courts sitting in Michigan. *Wolfe v. Perry*, 412 F.3d 707, 714 (6th Cir. 2005) (citing Mich. Comp. Laws § 600.5805(10)). The statute of limitations begins to run "when the plaintiff knows or has reason to know of the injury which is the basis of his action." *Sevier v. Turner*, 742 F.2d 262, 273 (6th Cir. 1984). A plaintiff may recover for earlier injuries, however, "where the plaintiff can show prior discriminatory activity that continues into the present, as opposed to prior discriminatory activity whose effects continue into the present, *see Tolbert v. State of Ohio Dept. of Transp.*, 172

F.3d 934, 940 (6th Cir.1999); and where the plaintiff can show 'a longstanding and demonstrable policy of discrimination.' *Dixon* [*v. Anderson*], 928 F.2d [212, 217 (6th Cir. 1991)]." *Bell v. Ohio State Univ.*, 351 F.3d 240, 247 (6th Cir. 2003).

In this case, the pre-2005 conduct about which the plaintiffs complain focuses entirely on the township's refusal to grant a variance. The Court has found, however, that this conduct will not support a cause of action. The actionable conduct surrounding the posting of the stop work order occurred in 2007 and thereafter. The statute of limitations defense would not bar recovery for that conduct.

### III.  Plaintiffs' Damages Expert

The defendants have filed a motion to strike the plaintiffs' economic loss expert report on the ground that the expert, Thomas Frazee, is not qualified to give an opinion on the rental value of the plaintiffs' property in Worth Township or property in East China Township that the plaintiffs occupied during the delayed construction. Frazee apparently is a chartered financial analyst and an Illinois-licensed CPA but not a licensed appraiser in the state of Michigan. The defendants cite Michigan Compiled Laws § 339.2601(a) for the proposition that a state license is required before an appraiser may render an opinion, conclusion, or analysis relating to the value of real property. The defendants also argue that Mr. Frazee's opinion did not comply with the requirements of section 339.2605(1), which imposes a requirement on the licensed property appraisers to use the uniform standards of professional appraisal practice ("USPAP"). The defendants also attack Frazee's methodology in calculating rental values, and they criticize his decisions to accumulate damages from 2005, when the variance issue was first in dispute, and to include the plaintiffs' attorney's fees incurred in the circuit court litigation.

Many of these questions are rendered moot by the decision on the summary judgment motions, which confines the relevant period for damages to the period following the stop work order. The argument that a lack of license or failure to follow the USPAP makes Mr. Frazee unqualified as an expert or invalidates his methodology fails as a matter of law because the state statute does not govern the admissibility of expert testimony in federal courts. The Federal Rules of Evidence govern those decisions. In fact, "the federal rules themselves provide that they 'apply generally to civil actions and proceedings.' Fed. R. Evid. 1101(b). Further, th[e Sixth Circuit] has categorically stated that '[t]he admissibility of expert testimony is a matter of federal, rather than state, procedure.'" *Legg v. Chopra*, 286 F.3d 286, 290 (6th Cir. 2002) (quoting *Brooks v. Am. Broad. Cos.*, 999 F.2d 167, 173 (6th Cir. 1993)).

Moreover, expert reports are governed by Federal Rule of Civil Procedure 26(a)(2). The reports must be exchanged on time, and they must contain the items listed in rule 26(a)(2)(B). the failure to timely serve a report or furnish a complete report may constitute grounds to strike the report under Rule 37(c). *See Phillips v. Cohen*, 400 F.3d 388, 402 (6th Cir. 2005). However, a disagreement over an expert's qualifications or the methodology employed in reaching an opinion generally will not amount to grounds for striking the report itself, as the defendants seek here. Those issues may be raised by timely objection at trial, or in a properly filed motion *in limine*. There is no basis to strike the expert report itself, and the defendants' motion to do so will be denied.

IV.

The Court finds that fact issues preclude summary judgment for either side on the plaintiffs' First Amendment retaliation claim, the defendants are entitled to summary judgement on the plaintiffs' equal protection claim, the plaintiffs are entitled to summary judgment on their procedural

due process claim based on posting the stop work order without notice and a hearing, the defendants are entitled to summary judgment on the substantive due process claim, and there are no grounds on which to strike the plaintiffs' expert witness report.

Accordingly, it is **ORDERED** that the defendants' motion for summary judgment [dkt #20] is **GRANTED IN PART AND DENIED IN PART**.

It is further **ORDERED** that the plaintiffs' motion for summary judgment [dkt #22] is **GRANTED IN PART AND DENIED IN PART**.

It is further **ORDERED** that count II and so much of count III of the complaint alleging a substantive due process violation are **DISMISSED**.

It is further **ORDERED** that count IV of the complaint is **DISMISSED as moot**.

It is further **ORDERED** that the defendants' motion to strike the plaintiffs' expert witness's economic loss report [dkt #21] is **DENIED**.

It is further **ORDERED** that counsel for the parties shall appear before the Court **on April 20, 2010 at 1:00 p.m** for a status conference to establish further case management deadlines.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:   April 9, 2010

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on April 9, 2010.

s/Teresa Scott-Feijoo
TERESA SCOTT-FEIJOO