UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GEORGE T. PAETH and
MARGARET C. PAETH,

        Plaintiffs,

v.

WORTH TOWNSHIP and
BARBARA CUTCHER,

        Defendants.

        Case Number 08-13926
        Honorable David M. Lawson

_____/

**OPINION AND ORDER DENYING MOTION FOR NEW TRIAL OR REMITTITUR**

Following a jury trial in which the plaintiffs were awarded $275,000 on a claim alleging retaliation in violation of the First Amendment and $325,000 on a claim for a procedural due process violation, defendant Worth Township filed a motion for new trial, or in the alternative remittitur, which is presently pending. The parties presented oral argument on the motion in open court on November 9, 2010. The Court now finds that the verdict is not beyond the maximum amount the jury reasonably could have found based on the evidence at trial. Therefore, respecting the jury's verdict, the motion will be denied.

I.

A lengthy recitation of the facts is not necessary. The parties are certainly familiar with the matter, and the proofs at trial tracked the facts presented by the parties in their motions for summary judgment, which were discussed in a previous opinion by the Court. *See Paeth v. Worth Twp.*, 705 F. Supp. 2d 753, 757-63 (E.D. Mich. 2010). For the purpose of the present motion, it is useful to recall that the Court found the first act of retaliation in violation of the First Amendment supported by the evidence occurred on May 24, 2006. *See Paeth v. Worth Twp.*, No. 08-13926 (E.D. Mich.

July 1, 2010) (order granting in part and denying in part defendant's motion *in limine*). That is the date of a Worth Township Zoning Board of Appeals (ZBA) hearing on the plaintiffs' variance request, which followed a decision by a state court concluding that the ZBA improperly denied the plaintiffs' request at an earlier hearing. That court ordered a new hearing, and the ZBA failed to notify the plaintiffs that the hearing would take place. The procedural due process violation took place on November 5, 2007, when a township official posted a stop work order on the plaintiff's property without prior notice required by state law or giving them an opportunity to be heard. That notice was posted after the state court once again ruled in the plaintiffs' favor and ordered the variance to be granted.

II.

The defendant seeks a new trial or, in the alternative, remittitur because it believes the jury verdicts of $325,000 and $275,000 were against the weight of the evidence. In moving for a new trial, the defendant does not dispute liability. It only challenges the amount of damages awarded.

Federal Rule of Civil Procedure 59 authorizes a court on motion to "grant a new trial on all or some of the issues . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court . . . ." Fed. R. Civ. P. 59(a)(1). Although Rule 59 does not specify the grounds for granting a new trial, courts have determined that "a new trial is warranted when a jury has reached a 'seriously erroneous result' as evidenced by: (1) the verdict being against the weight of the evidence; (2) the damages being excessive; or (3) the trial being unfair to the moving party in some fashion, i.e., the proceedings being influenced by prejudice or bias." *Holmes v. City of Massillon, Ohio*, 78 F.3d 1041, 1045-46 (6th Cir. 1996); *see also Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940). The Court also has discretion to

consider other grounds "rais[ing] questions of law arising out of substantial errors in admission or rejection of evidence or instructions to the jury." *Bourgeois v. Strawn*, 501 F. Supp. 2d 978, 985 (E.D. Mich. 2007) (quoting *Montgomery Ward*, 311 U.S. at 251). "The absence of a listing of specific grounds should not obscure the governing principle. The court has the power and duty to order a new trial whenever, in its judgment, this action is required in order to prevent injustice." 11 Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice and Procedure § 2805 (2d ed. 1995).

"In considering a motion for a new trial on the ground that the verdict is against the weight of the evidence, the court is not to set aside the verdict simply because it believes that another outcome is more justified. [Instead,] [t]he court is to accept the jury's verdict if it is one which reasonably could have been reached." *Denhof v. City of Grand Rapids*, 494 F.3d 534, 543 (6th Cir. 2007) (citations and quotations omitted). The Sixth Circuit has repeatedly cautioned that "close scrutiny" is necessary in this situation. *See, e.g.*, *ibid.*, *Duncan v. Duncan*, 377 F.2d 49 (6th Cir. 1967). "The Supreme Court has noted that 'the authority of trial judges to grant new trials' pursuant to Rule 59(a) 'is large.'" *Bell v. Johnson*, 404 F.3d 997, 1002 (6th Cir. 2005) (quoting *Gasperini v. Ctr. for the Humanities, Inc.*, 518 U.S. 415, 433 (1996)).

"As a general rule," the Sixth Circuit has "held that a jury verdict will not be set aside or reduced as excessive unless it is beyond the maximum damages that the jury reasonably could find to be compensatory for a party's loss." *Am. Trim, L.L.C. v. Oracle Corp.*, 383 F.3d 462, 475 (6th Cir. 2004) (internal quotation marks omitted). A district court has discretion to remit a compensatory damages "verdict only when, after reviewing all the evidence in the light most favorable to the prevailing party, it is convinced that the verdict is clearly excessive; resulted from

passion, bias, or prejudice; or is so excessive or inadequate as to shock the conscience of the court." *Ibid.* "If there is any credible evidence to support a verdict, it should not be set aside." *Ibid.*

Therefore, court may not remit a valid jury verdict "'unless it is beyond the maximum damages that the jury reasonably could find to be compensatory for a party's loss.'" *Denhof v. City of Grand Rapids*, 494 F.3d 534, 547 (6th Cir. 2007) (quoting *Farber v. Massillon Bd. of Educ.*, 917 F.2d 1391, 1395 (6th Cir. 1990)). The Sixth Circuit clarified this broad standard, explaining that "[a] court should not reduce an award unless it is: 1) beyond the range supported by proof; 2) so excessive as to shock the conscience; or 3) the result of mistake." *Ibid.* (citing *Bickel v. Korean Air Lines Co.*, 96 F.3d 151, 156 (6th Cir. 1996)).

"[T]he basic purpose of § 1983 damages is to compensate persons for injuries that are caused by the deprivation of constitutional rights." *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 307 (1986) (citing *Carey v. Piphus*, 435 U.S. 247, 254 (1978)). "[C]ompensatory damages may include not only out-of-pocket loss and other monetary harms, but also such injuries as impairment of reputation . . ., personal humiliation, and mental anguish and suffering." *Id.* at 307. The Court cannot award compensatory damages for a procedural due process violation "without proof that . . . injury actually was caused." *Carey*, 435 U.S. at 264 ("[A]lthough mental and emotional distress caused by the denial of due process itself is compensable under § 1983, we hold that neither the likelihood of such injury nor the difficulty of proving it is so great as to justify awarding compensatory damages without proof that such injury actually was caused.").

"[T]he abstract value of a constitutional right may not form the basis for § 1983 damages." *Stachura*, 477 U.S. at 308. Courts may award presumed damages as a substitute for ordinary compensatory damages when "a plaintiff seeks compensation for an injury that is likely to have

occurred but difficult to establish." *Id.* at 310-11. Unlike procedural due process damages, the Sixth Circuit had held "that general damages are presumed to occur when First Amendment rights are violated." *Parrish v. Johnson*, 800 F.2d 600, 606-07 (6th Cir. 1986) (citing *Walje v. City of Winchester, Ky.*, 773 F.2d 729, 732 (6th Cir. 1985) ("The District Court therefore erred in concluding that the plaintiff was restricted to nominal damages in the absence of proof of actual injury caused by the defendants' violation of his free speech rights, and we remand this issue for a determination of the amount of general damages . . . .")). The *Parrish* Court believed that such a rule followed *Carey*'s mandate of "adapting common-law rules of damages to provide fair compensation for injuries caused by the deprivation of a constitutional right," *id.* at 608-09 (quoting *Carey*, 435 U.S. at 258), because the Supreme Court recognized that in "some cases damages may be presumed merely from the act constituting the constitutional violation," *id.* at 609 (quoting *Stachura*, 477 U.S. at 310-11). "General damages are thus necessary in order to fully vindicate the challenged substantive right and to deter future conduct that threatens its practical significance." *Walje*, 773 F.2d at 732.

As noted above, there are verdicts on two separate counts in this case. The defendant argues that there is no proof of any economic damages that flowed from the procedural due process violation. The defendant reasons that damages on this count, if any, must be confined to the twenty-four-hour window that existed from the time the stop work order was posted to the time it would have been posted had proper notice been given. The defendant contends that no proof of damages was offered for this tiny time period, and the jury's verdict cannot be reconciled with the evidence.

The defendant overlooks the point that the Due Process Clause requires notice to be given to provide the plaintiffs an opportunity to respond and present reasons in support of their position.

That opportunity is not without meaning or a mere formality. Certainly the proofs at trial suggested that Barbara Cutcher entertained considerable doubt about the propriety of posting the order, after a series of state court decisions had confirmed the validity of the plaintiffs' variance request. If notice had been given, the plaintiffs may have been able to persuade the building authorities to stand down and interfere no more in their effort to construct their home. They may have been able to reason with cooler minds and been allowed to proceed with their construction. After all, the state building authorities tended to support their position. The stop work order remained in place from November 5, 2007 until it was withdrawn after the lawsuit was commenced in the fall of 2008. Its posting was publicly displayed on the plaintiffs' property, and it tended to validate — wrongfully — the Township's position to all that could observe it, including the plaintiffs' neighbors.

The acts of retaliation in violation of the First Amendment likewise caused considerable delay and frustration to the plaintiffs. Mr. and Mrs. Paeth also testified that they incurred actual expenses as a result of the delay. Although plaintiffs' counsel could have done a better job developing the economic damage evidence, the Paeths described the expenses they incurred with sufficient detail to permit the jury to take those items into account in reaching a damage award.

The entirety of the plaintiffs' testimony regarding damages is as follows, beginning with the testimony of George Paeth:

> Q: Mr. Paeth, did you and your wife suffer any type of actual damages as a result of the conduct taken by the Township posting the stop work order and not providing you notice and opportunity to come to the May 24, 2006?
> A: Yes, we did.
> Q: Can you describe for the jury what those damages are?
> A: Again, probably not all of them, but, you know, we had to pay approximately $33,000 in legal fees. We continued to pay our mortgage and our taxes and our insurance on property that we had no access to and no use of. And obviously, there were – we had to take time off from work and other miscellaneous expenses.

Q: Could you get construction finances between 2004 and today?
A: We – we had arranged for finances in late 2003, but subsequent to that, we haven't been able to get additional financing.
Q: Why is that?
A: Just because of the state of the issues with the house, with it being – with the stop work order posted and the restrictions from the Township.
Q: How about since October of 2008, when the Court ordered the stop work order to be removed, have you been able to get construction financing for the home?
A: No.
Q: And why is that?
A: Partly that's just based on the financial situation we find ourselves in now, because of legal fees and other expenses that we have incurred. We're not in a position to be able to secure financing.
Q: How have you been able to pay for the work that you have been doing on the house since 2008?
A: It's what we can do out of pocket.
Q: Have you had to liquidate any of your assets?
A: I cashed in a life insurance policy. I redeemed both IRA's and 401 retirement plans.
Q: Have you suffered any type of pain and suffering because of the action taken by the Township?
A: Yes.
Q: Can you describe to the jury what that is?
A: I'm not sure I can describe it. It's indescribable. We have been through this period for – for ten years, at least six years, since the initial order that we couldn't work on the house. We never knew when it was going to come to an end. We had threats that the Township was going to demolish the house. We had no idea any day when we woke up whether or not that was going opt be the day that our home would be demolished. We had no options. We couldn't complete the house and use it. We couldn't sell it. We couldn't buy another property, because we had no other financial resources to go buy another property. It was – it was an albatross.
Q. Can you describe for the jury the size of the house that you live in today?
A. It's approximately 440 square feet. It's about the size of a two-car garage.
Q. And this house in Worth Township was going to be your marital home?
A. Yes.
Q. How big was it going to be when it was completed?
A. It will be just less than 2,000 square feet.
Q. Have you suffered any type of personal humiliation as a result of the action taken by the Township?
A. Yes. The entire community there is continuing to make statements that we violated the law and that we were flagrantly in violation of ordinances and we had total disregard for any of the construction practices.

| | | |
|---|---|---|
| Q. | Has that affected you personally? |
| A. | Yes. |
| Q. | How? |
| A. | I take it very seriously. I work in the construction industry. I know what the rules are. |
| Q. | How does it make you feel? |
| A. | I'm incensed that anyone would ever suggest that I intended to break a law. |
| Q. | Has this affected your relationship with your wife? |
| A. | Yes, it has. |
| Q. | How is that? |
| A. | It's been very difficult for us living in a small house. I know she looked to me to resolve this issue and I couldn't. |
| Q. | Why couldn't you? |
| A. | The Township was so consumed with keeping us from building this house that they ignored their own ordinances and the building code. They violated state law. And they denied us our constitutional rights. |

Trial Tr., Aug. 10, 2010 (testimony of George Paeth).

Margaret Paeth's testimony also contains important proof of damages:

| | |
|---|---|
| Q. | Have you suffered any actual damages as a result of the action taken by Worth Township over the last four, six years, I guess? |
| A. | Well, if you're asking if we have had, like, mortgages and insurance and all those types of things, yes. We had – I mean we weren't able to live in the house. We still had to pay the mortgage and the interest and all of that, and that was in excess of $24,000. We had utilities. We had insurance that was, I don't even know, like in excess of $3,500. And we had taxes on the property somewhere around $6,000. And the association fees. Legal fees that were, you know, $650 an hour. I mean, it was ridiculous. We were just – costs were exorbitant. We had all kinds of expenses. |
| Q. | Have you suffered any type of emotional distress as a result of the conduct of the Township? |
| A. | Yeah, I would say we have. |
| Q. | Can you describe to the jury what that – what that distress is? |
| A. | It's very difficult to put it into words, but I will try. It's sort of like every morning when you wake up, it's the first you think about, and every night when you go to sleep, it's the last thing you think about. And all my husband and I ever wanted to do was to get our house built. We have lived in a little tiny house. I'm sorry. We have been denied so much because of some person's inability to understand that our house was nonconforming, and that that setback, that side-yard setback that they gave us permission to go ahead and build into that side-yard setback, and because they changed their mind, and they wouldn't listen to reason, they did – we – because I pleaded with |

them, even, to get onto the variance hearing schedule quickly. That's why they waited eleven months, because –

MR. SEIBERT: Objection. This is a narrative, Judge.

THE WITNESS: I'm sorry, but I –

MR. SEIBERT: This is a narrative well beyond the question of what the damages are.

THE COURT: I disagree. The objection is overruled.

THE WITNESS: The damages, I can't even tell you. It affected everything in our life.

Q. How did it affect your relationship with your husband?

A. My husband, he is involved in code issues all the time and he felt as if head let me down somehow, because this was supposed to be where we were supposed to live, and he goes in front of Zoning Board of Appeals people all the time and he never, ever loses. He always has the right information. There is always a way to come to the table and figure out how to fix things. And he couldn't fix this. So he – it – he felt as if he had somehow not lived up to my expectations. So if that's what you're asking about, how it affected our relationship, it was –

Q. How did it affect your home life?

A. Well, once again, we live in a little tiny house and if you – you tried to live in a little house and you have – I mean, I feel like my life has been in a box. It's the best thing I can do to explain it to you. Because there is no place we have. I have to pack up all of our winter clothes and take them to my mother's when it's not winter, and I have to take all of our summer clothes and pack them up when the end of summer comes, because we don't have room.

Q. Can you describe for the jury the Worth Township home? Is there anything inside the that house right now?

A. Yes.

Q. What is inside?

A. We have numerous building materials in there. We have some of our personal possessions in there. We have, like, sinks and toilets and hot water heaters and siding and we just haven't been able to use it.

Q. You're not able to install those right now?

A. Right.

Q. Financially, how has this matter affected you?

A. That's – that's the worst part of it all. We have had to cash in my husband's life insurance. We have had to cash in our retirement. It's taken every bit of our savings. It's taken – we have a second mortgage on the house that we live in now. We have a second mortgage on the house at Lexington.

Q. Are you able to get construction financing for the house in Lexington?

A. Not at all.

Q. Or in Worth, I'm sorry.

A. No.

| | Q. | Are you able to live in the house in Worth Township right now? |
| --- | --- | --- |
| | A. | No. |
| | Q. | Are you able to pay for contractors to finish up the home in Worth Township? |
| | A. | No. |

Trial. Tr., Aug. 11, 2010, at 191:21-195:10 (testimony of Margaret Paeth).

The plaintiffs may be compensated for out-of-pocket losses, other monetary harms, impairment of reputation, personal humiliation, and mental anguish and suffering. In the time frame that the stop work order was in place, and for the period before that beginning May 24, 2006, the plaintiffs paid their mortgage, insurance, taxes, and legal fees. Ms. Paeth testified that the plaintiffs spent roughly $24,000 on their mortgage, over $3,500 on insurance, and $6,000 taxes, and Mr. Paeth testified that the plaintiffs spent roughly $33,000 in legal fees, totaling roughly $67,500. That does not include the personal humiliation and impairment of reputation the plaintiffs suffered, the inability to find financing, and the mental anguish and suffering because of the stop work order. Ms. Paeth's testimony is particularly descriptive of the mental turmoil and frustration the plaintiffs endured throughout their ordeal. As noted above, she pointedly described the daily feelings of defeat and angst that came with each fruitless encounter with township officials who changed their minds and entrenched themselves in their unreasonable objections to the plaintiffs' proposed building project.

The Court concludes that evidence at trial supports the jury's damage verdict on each of the counts submitted to it.

III.

For the reasons stated, the Court does not find that the damages were excessive, the verdict was against the weight of the evidence, or the trial was unfair. The Court does conclude that the verdict was within the maximum damages that the jury reasonably could find to be compensatory for the plaintiffs' loss, and the damage award was supported by credible evidence. The Court previously granted a stay of the judgment while the post-trial motions remained pending. Now that those motions have been decided, the stay will be dissolved.

Accordingly, it is **ORDERED** that the defendant's motion for a new trial or, in the alternative, remittitur [dkt. #70] is **DENIED**.

It is further **ORDERED** that the stay of enforcement of the judgment is **DISSOLVED**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated: November 22, 2010

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on November 22, 2010.

s/Deborah R. Tofil
DEBORAH R. TOFIL